284 P.3d 956

**Douglas LEONE and Patricia A. Perkins–Leone, as Trustees under that certain unrecorded Leone–Perkins Family Trust dated August 26, 1999, as amended, Plaintiffs–Appellants**

v.

**COUNTY OF MAUI, a political subdivision of the State of Hawai'i, William Spence, in his capacity as Director of the Department of Planning of the County of Maui, DOE Entities 1–50, Defendants–Appellees (Civil No. 07–1–0496(3)).**

and

**William L. Larson and Nancy H. Larson, as Trustees under that certain unrecorded Larson Family Trust dated October 30, 1992, as amended, Plaintiffs–Appellants**

v.

**County of Maui, a political subdivision of the State of Hawai'i, William Spence, in his capacity as Director of the Department of Planning of the County of**

**Maui, Doe Entities 1–50, Defendants–Appellees (Civil No. 09–1–0413(2)).**

**No. 29696.\***

Intermediate Court of Appeals of Hawai'i.

June 22, 2012.

---

\* On November 9, 2010, Case Nos. 29696 and 30159 were consolidated in Case No. 29696.

Andrew V. Beaman (Chun, Kerr, Dodd, Beaman & Wong), (Leroy E. Colombe and Bethany C.K. Ace), with him on the briefs, for Plaintiffs–Appellants.

Mary Blaine Johnston, Deputy Corporation Counsel (Brian T. Moto, Corporation Counsel, and Madelyn D'Enbeau, Deputy Corporation Counsel), with her on the briefs, for Defendants–Appellees.

NAKAMURA, Chief Judge, FOLEY and LEONARD, JJ.

Opinion of the court by LEONARD, J.

In this consolidated appeal, Plaintiffs–Appellants Douglas Leone and Patricia A. Perkins–Leone (**Leones**), as Trustees under that certain unrecorded Leone–Perkins Family Trust dated August 26, 1999, as amended, appeal from the Circuit Court of the Second Circuit's (**Circuit Court**) June 5, 2009 Amended Final Judgment dismissing their inverse condemnation, equal protection, due process, and 42 U.S.C. § 1983 claims.[1] Plaintiffs–Appellants William L. Larson and Nancy H. Larson (**Larsons**), as Trustees under that certain unrecorded Larson Family Trust dated October 30, 1992, as amended, appeal from the Circuit Court's October 15, 2009 Final Judgment dismissing their inverse condemnation, equal protection, due process,

1. The Honorable Joseph E. Cardoza presided.

and 42 U.S.C. § 1983 claims, which are, in relevant part, identical to the Leones' claims.[2]

The Leones and Larsons (collectively, **Appellants**) argue that the Circuit Court erred in dismissing their claims for lack of subject matter jurisdiction on ripeness grounds. They also request that this court grant partial summary judgment against Defendants–Appellees County of Maui (**Maui County**) and Director of the Department of Planning of the County of Maui, William Spence (**Director**),[3] on their claims of inverse condemnation. For the reasons discussed below, we conclude that the Circuit Court erred in dismissing Appellants' inverse condemnation claims as unripe. However, we decline to grant Appellants' request for partial summary judgment. Accordingly, we vacate the judgments and remand for further proceedings.

## I. *BACKGROUND*

This appeal arises from Maui County's troubled attempts to create a public park at Palauea Beach in Makena, Maui. The 1998 Kihei–Makena Community Plan (**Community Plan**) assigned the beach lots a "park" land use designation, which does not permit the construction of single-family residences. In 1996, the Maui County Council (**County Council**) adopted Resolution No. 96–121, authorizing the Mayor to acquire the Palauea Beach lots for the creation of a public park. At that time, Palauea Beach was "one of the last undeveloped leeward beaches on Maui," and the County Council noted "an outpouring of community support" for the creation of a beach park.

In 1999, the County Council adopted Resolution No. 99–183, affirming its "official policy" to "preserve Palauea Beach in South Maui." Despite the Mayor's "appropriately raised concerns about the County's present financial constraints," the County Council urged the administration to acquire two of the Palauea Beach lots. Maui County pur-

chased the two lots in January of 2000. However, it was unable to allocate sufficient funds to purchase the remaining seven lots, which were then sold to private individuals.

The Leones purchased Palauea Beach parcel 15 in February of 2000. The Larsons purchased Palauea Beach parcels 16 and 17 in December of 2000. Their properties are zoned "Hotel–Multifamily," permitting a variety of economically beneficial uses, including single-family residences. However, these parcels are among nine Palauea Beach lots that are designated "park" in the Community Plan.

The Palauea Beach lots are also located in a "special management area" (**SMA**) under the Hawai'i Coastal Zone Management Act (**CZMA**). *See* Hawai'i Revised Statutes (**HRS**) § 205A–22 (2001). The CZMA was enacted, pursuant to the federal Coastal Zone Management Act, to protect valuable shoreline and coastal resources by establishing heightened land use controls on developments within protected zones, or special management areas. HRS § 205A–21 (2001). The Legislature delegated responsibility for administering the SMA provisions to the county planning commissions or councils. HRS § 205A–22.

The CZMA imposes stringent permit requirements for "developments" within special management areas. HRS §§ 205A–28, 205A–26 (2001). The term "development" expressly excludes, *inter alia*, single-family residences, *unless* the relevant county authority finds the proposed construction may have a "cumulative impact, or a significant environmental or ecological effect on a special management area[.]" HRS § 205A–22 (2001 & Supp.2011). Three types of SMA permits are available, depending on the nature of the proposed development: minor use permits, major use permits, and emergency use permits. *Id.* The CZMA empowers the county authorities to adopt rules implementing procedures for issuing SMA permits. HRS § 205A–29(a) (2001).

**2.** The Honorable Shackley R. Raffetto presided.

**3.** During the pendency of this Appeal, William Spence, Director of the Department of Planning of the County of Maui, succeeded Jeffrey S.

Hunt. Thus, pursuant to Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 43(c), Spence has been substituted automatically for Hunt in this case.

In its rules implementing the CZMA, Maui County offers an assessment procedure allowing, *inter alia,* landowners to seek a determination that their proposed use is not a "development" under HRS § 205A–22. *See* Maui Department of Planning Special Management Area Rules for the Maui Planning Commission Rule (**SMA Rule**) 12–202–12 (2004). Upon review of an assessment application, the Director must make a determination that the proposed use either:

(1) Is exempt from the requirements of this chapter because it is not a development pursuant to section 205A–22, HRS, as amended;

(2) Requires a special management area minor permit pursuant to section 205A–22, HRS, as amended, which shall be processed in accordance with section 12–202–14;

(3) Requires a special management area use permit pursuant to section 205A–22, HRS, as amended, which shall be processed in accordance with sections 12–202–13 and 12–202–15;

(4) Requires a special management area emergency permit pursuant to section 205A–22, HRS, as amended, which shall be processed in accordance with section 12–202–16; or

(5) *Cannot be processed because the proposed action is not consistent with the county general plan, community plan, and zoning, unless a general plan, community plan, or zoning application for an appropriate amendment is processed concurrently with the SMA permit application.*

SMA Rule 12–202–12(f) (emphasis added).

Appellants and other Palauea Beach lot owners sought to construct single-family residences on their respective properties. The Director, *inter alia,* initiated a process for changing the Community Plan designation from "park" to "residential." Property owners, including Appellants, funded the requisite environmental assessment because Maui County was unable to do so. However, the Planning Commission refused to accept the environmental assessment and instead requested additional archaeological studies and historical narratives. Several commissioners advocated for prolonging the amendment process as a deliberate strategy to preserve the status quo—a de facto beach park on the privately-owned lots. As one commissioner explained:

So if we decide on no action on this thing then the whole beach would remain as it is now and they would not be able to build on the land that they own. Granted, we can't buy it but if we say no you can't develop it then we then have access to it, at least the beach.

This strategy would "allow the people of Maui to utilize [the] beach area" while preventing property owners from constructing homes. Another commissioner acknowledged that moving forward with the process would result in a loss of the "de facto parking that people are enjoying now" on the private lots and could force Maui County to use its own parcels for parking. At least one commissioner expressly sought to preserve the public's illegal camping, which had resulted in littering, defecating, and parking on the private beach lots, bemoaning the landowners' resort to hiring security guards to remove the trespassers.

Appellants nevertheless filed assessment applications under SMA Rule 12–202–12, seeking a determination that their proposed use is exempt from the SMA permit requirements. The Director rejected Appellants' applications because, *inter alia,* the proposed use was inconsistent with the properties' "park" designation in the Community Plan.[4]

Appellants then filed inverse condemnation claims under article I, § 20 of the Hawaiʻi Constitution and the Fifth and Fourteenth Amendments to the United States Constitution, alleging that Maui County had engaged in regulatory takings by depriving their properties of any economically viable use.

---

4. The Larsons' assessment application apparently did not comply with certain other requirements of SMA Rule 12–202–12. However, upon the Director's determination that the application could not be processed due to inconsistency with the Community Plan, any other deficiencies became irrelevant to the ripeness analysis because, even if such deficiencies were remedied, the application could not be processed.

They also asserted equal protection and substantive due process violations and, pursuant to 42 U.S.C. § 1983, sought compensatory damages, attorneys' fees, and punitive damages. In both cases, Maui County filed motions to dismiss or, in the alternative, for summary judgment. The County's argument in both cases was that Appellants' claims were not ripe because they failed to exhaust available administrative remedies.

The Circuit Court dismissed all claims in both cases for lack of subject matter jurisdiction on ripeness grounds. It concluded that the claims were unripe for adjudication because Appellants failed to exhaust administrative remedies, namely: (1) appealing the Director's decision to the Planning Commission; (2) waiving assessment procedure and submitting an SMA permit application; and (3) seeking an amendment to the Community Plan to change the properties' designation from "park" to "residential." The court rejected Appellants' contention that such remedies would be futile.

The Leones and Larsons timely filed notices of appeal.

## II. POINTS ON APPEAL

Appellants' core argument on appeal is that the Circuit Court erred in concluding their claims were unripe for adjudication. More specifically, Appellants raise the following points of error:

(1) The Circuit Court erred in concluding that they were required to exhaust all available administrative remedies;

(2) The Circuit Court erred in concluding that Appellants' failure to appeal the Director's determination to the Maui Planning Commission rendered their claims unripe; and

(3) The Circuit Court erred in concluding that Appellants' failure to seek a community plan amendment rendered their claims unripe.

## III. APPLICABLE STANDARD OF REVIEW

█ "It is axiomatic that ripeness is an issue of subject matter jurisdiction." *Kapuwai v. City & Cnty. of Honolulu, Dep't of Parks & Recreation*, 121 Hawai'i 33, 39, 211 P.3d 750, 756 (2009). "Whether a court possesses subject matter jurisdiction is a question of law reviewable *de novo*." *Kaho'ohanohano v. Dep't of Human Servs.*, 117 Hawai'i 262, 281, 178 P.3d 538, 557 (2008) ([internal quotation marks] and [citation] omitted).

## IV. DISCUSSION

The Circuit Court's sole determination was that Appellants' claims were not ripe and, therefore, the Circuit Court lacked subject matter jurisdiction. Accordingly, on this appeal, we will consider only that issue.

### A. Inverse Condemnation and Regulatory Takings

█ The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides, in relevant part, that "private property [shall not] be taken for public use, without just compensation." Article I, § 20 of the Hawai'i Constitution likewise provides: "Private property shall not be taken or damaged for public use without just compensation." Thus, a governmental body can take private property, but it is subject to the requirements of a "public purpose" and "just compensation" to the property owner. *See, e.g., Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537–38, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (discussing the Takings Clause of the Fifth Amendment).

█ Within these constitutional parameters, the State of Hawai'i or any county may exercise the power of eminent domain by instituting proceedings for the condemnation of private property, as set forth in HRS Chapter 101 (Eminent Domain). Although not specifically provided by statute, an "inverse condemnation" proceeding is the means by which a property owner can seek to recover the value of property that has been taken by the government for public use without exercising the power of eminent domain. *See Black's Law Dictionary* 332 (9th ed.2009) (defining "inverse" condemnation).

Until the United States Supreme Court's decision in *Pennsylvania Coal Co. v. Mahon*,

260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), only the direct appropriation or physi-cal invasion of privately-held property was considered to effect a taking. *Lingle,* 544 U.S. at 537, 125 S.Ct. 2074. Beginning with Justice Holmes's decision in *Pennsylvania Coal,* the Supreme Court recognized that, in some instances, land use regulations can go "too far" and thus reduce the use of the property to such an extent that it constitutes a "regulatory taking" requiring just compen-sation under the Fifth Amendment. *Id.* at 537–39, 125 S.Ct. 2074, citing, *inter alia, Pennsylvania Coal,* 260 U.S. at 413, 415, 43 S.Ct. 158; *see also* David L. Callies, *Takings: An Introduction and Overview,* 24 U. Haw. L.Rev. 441, 443 (2002).

The Supreme Court has recognized at least two categories of compensable regulato-ry takings: (1) where "regulations [ ] compel the property owner to suffer a physical 'inva-sion' of his property ... no matter how minute the intrusion"; and (2) "where regu-lation denies all economically beneficial or productive use of land." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (citations omitted). In this case, Appellants appear to contend that, in denying them the opportunity to build a single-family resi-dence, Maui County has deprived them of all economically beneficial use of their property.[5]

### B. *Ripeness*

■■■ The Supreme Court has further held that, before a property owner may initi-ate a suit seeking compensation for a taking, the claim must be ripe. *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). A claim that the application of a regulation effects a tak-ing becomes ripe when "the government enti-ty charged with implementing the regula-tions has reached a final decision regarding the application of the regulations to the prop-erty at issue." *Id.* In *Williamson,* the re-spondent sought to develop residential homes on its tract of land. *Id.* at 178–81, 105 S.Ct.

3108. The Planning Commission refused to approve the preliminary plat because it failed to conform to various subdivision regulations. *Id.* at 181, 187–88, 105 S.Ct. 3108. The Court held that the takings claims were un-ripe because the respondent failed to seek available variances, and thus the decision was not final. *Id.* at 188, 193–94, 105 S.Ct. 3108. Ripeness arises when the land-use authority "has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Id.* at 191, 105 S.Ct. 3108.

■■■ This finality requirement is rooted in the nature of the Takings Clause inquiry. *Id.* at 190–91, 105 S.Ct. 3108. Absent a final decision, courts cannot accurately examine the economic impact of the regulation on the property at issue. *Id.; Palazzolo v. Rhode Island,* 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). Courts cannot deter-mine whether a land use restriction goes "too far," so as to constitute a regulatory taking, until the appropriate agency has determined just how far the regulation extends. *Mac-Donald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) (quoting *Pennsylvania Coal,* 260 U.S. at 415, 43 S.Ct. 158). Nor can they determine whether any "beneficial use" re-mains, a core aspect of the inverse condem-nation inquiry. *Williamson,* 473 U.S. at 189 n. 11, 105 S.Ct. 3108. Likewise, the "just compensation" determination is dependent on a final decision. *Id.* at 190–91, 105 S.Ct. 3108. Ripeness is therefore a prerequisite to the examination of the takings claim itself. *Id.*

■■■ Moreover, land use determina-tions often involve a high degree of discre-tion. *Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448. The ripeness doctrine, as applied in inverse condemnation cases, ensures that courts do not prematurely deprive land-use authorities of the opportunity to exercise dis-cretion in favor of the landowner. *Id.* The relevant land-use authority, utilizing reason-

---

**5.** As the only issue before us is whether Appel-lants' claims are ripe for adjudication, and Ap-pellants' claim that they have been deprived of all economically beneficial use, we need not ad-dress the distinction between total takings and partial takings. *See generally* Callies, *Takings,* 24 U. Haw. L.Rev. at 445–50.

able procedures, must first have decided "the reach of a challenged regulation." *Id.* If the land-use authority retains the ability to modify or revoke its decision, a court cannot possibly discern "the nature and extent of permitted development" on the subject property. *MacDonald, Sommer & Frates,* 477 U.S. at 351, 106 S.Ct. 2561. However, "once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448.

C. *Ripeness versus Exhaustion of Administrative Remedies*

The Supreme Court in *Williamson* recognized the distinction between the ripeness doctrine and the exhaustion of administrative remedies. *Williamson,* 473 U.S. at 192–93, 105 S.Ct. 3108. Citing *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the respondent in *Williamson* argued that it should not be required to seek variances that would have allowed it to develop its property "because its suit is predicated upon 42 U.S.C. § 1983, and there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action." *Id.* at 192, 105 S.Ct. 3108. The Court explained why that assertion could not be sustained and, in doing so, explained the difference between ripeness and exhaustion:

> The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable. While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse

decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. *Patsy* concerned the latter, not the former.

The difference is best illustrated by comparing the procedure for seeking a variance with the procedures that, under *Patsy,* respondent would not be required to exhaust. While it appears that the State provides procedures by which an aggrieved property owner may seek a declaratory judgment regarding the validity of zoning and planning actions taken by county authorities ..., respondent would not be required to resort to those procedures before bringing its § 1983 action, because those procedures clearly are remedial. *Similarly, respondent would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking.*

Resort to those procedures would result in a judgment whether the Commission's actions violated any of respondent's rights. In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed. The Commission's refusal to approve the preliminary plat does not determine that issue; it prevents respondent from developing its subdivision without obtaining the necessary variances, but leaves open the possibility that respondent may develop the subdivision according to its plat after obtaining the variances. In short, the Commission's denial of approval does not conclusively determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision.

*Williamson,* 473 U.S. at 192–94, 105 S.Ct. 3108 (citations omitted; emphasis added).[6]

---

6. *Williamson* enunciated a second barrier to ripeness in federal court takings cases, which is that the plaintiff must first seek compensation through the procedures that a state provides for

seeking just compensation, or demonstrate that such procedures are unavailable or inadequate. *Williamson,* 473 U.S. at 194–97, 105 S.Ct. 3108.

■ Thus, ripeness, in the context of a takings claim, simply requires a final, definitive, decision by the initial land-use decision-maker regarding how it will apply the regulations at issue to the subject property, which inflicts an actual, concrete injury. If the regulatory scheme allows for a variance from the requirements of the land-use law, then a decision that does not foreclose a variance is not a final decision regarding the extent of governmental restriction on the subject property. However, as noted above, once that final decision is made, no appeal is required, and no collateral declaratory judgment action attacking the application of the land use law is required, for the takings claim to become ripe. The exhaustion doctrine, by contrast, applies when a party seeks judicial review of the substance of an adverse administrative decision. Thus, exhaustion of any appeals permitted within the administrative process is required before seeking relief from the courts.

■ Although perhaps less explicitly, Hawai'i case law is in accord. Under the exhaustion doctrine, "if an administrative remedy is provided by statute, a claimant must seek relief first from the administrative body before judicial relief is available." *Williams v. Aona*, 121 Hawai'i 1, 9, 210 P.3d 501, 509 (2009) (internal quotation marks and citation omitted). In such cases, in the interest of judicial economy, "the doctrine of exhaustion of remedies *temporarily* divests a court of jurisdiction." *Id.* In *Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw. 81, 734 P.2d 161 (1987), the Hawai'i Supreme Court discussed "primary jurisdiction" cases, in which claims are "originally cognizable in the courts," but their enforcement requires resolution of issues that have been delegated to administrative agencies. *Id.* at 93, 734 P.2d at 168 (citation omitted). In such cases, courts should suspend review pending the administrative disposition of issues the agency is empowered to resolve. *Id.* Similarly, the exhaustion doctrine provides that where a claim is "cognizable in the first instance by an administrative agency alone", courts may not interfere in the agency's decision-making until all relevant administrative remedies

have been exhausted. *Id.* at 93, 734 P.2d at 169 (citation omitted). These principles are doctrines of comity designed to outline the relationship between courts and administrative agencies and secure their proper spheres of authority. *Id.* at 93, 734 P.2d at 168.

■ Where landowners seek to challenge the decision of a land-use authority under the CZMA, HRS sections 91–14 and 205A–6(c) provide the mechanism for judicial review. *See Kona Old*, 69 Haw. at 91–93, 734 P.2d at 167–69. This review requires judicial intervention in matters that have been placed "within the special competence of the county planning department." *Id.* at 93, 734 P.2d at 169 (internal quotations and citation omitted). Accordingly, for courts to exercise jurisdiction in this situation, landowners must first demonstrate that they have sought relief on their dispute through available administrative remedies, including any administrative review process. *Id.*

■ On the other hand, where landowners do not challenge the substance of the decision of the land-use authority, but instead raise constitutional claims based on the effect of the decision, the doctrines of exhaustion and primary jurisdiction are not implicated. In such cases, the ripeness doctrine operates to "prevent courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Grace Bus. Dev. Corp. v. Kamikawa*, 92 Hawai'i 608, 612, 994 P.2d 540, 544 (2000) (citation and internal quotation marks omitted). Ripeness only requires that the appropriate agency make a formal, final, concrete determination that affects the party before it. *Id.; accord Williamson*, 473 U.S. at 193, 105 S.Ct. 3108 (takings claim is ripe when "the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury"). Thus, the ripeness issue before us is whether a formal, final, concrete

This second requirement is plainly inapplicable to state court proceedings.

determination has been made affecting Appellants' use of their properties.

### D. *Application of the Ripeness Doctrine*

Turning to the case at hand, we must decide whether the Director's refusal to process Appellants' assessment applications constituted final decisions regarding the application of the subject regulations to the properties at issue. *Williamson*, 473 U.S. at 186, 105 S.Ct. 3108. Maui County argues, and the Circuit Court concluded, that Appellants' claims are not ripe because: (1) Appellants failed to exhaust the administrative remedy of an appeal of the Director's decision to the Commission; and (2) Appellants failed to apply for an Amendment to the Community Plan.

### 1. *The Director's Decision Was a Final Decision*

▉ The parties dispute whether, under the applicable rules, an appeal from the Director's decision to the Commission was available to Appellants in this case. Maui County cites SMA Rule 12–202–26, which provides that an "[a]ppeal of the director's decision may be made to the commission." Appellants contend, based on arguments of statutory construction, that the appeals process set forth in SMA Rule 12–202–26 applies to other parts of the SMA Rules, but that it does not apply to the Director's decision, under SMA Rule 12–202–12, refusing to process Appellants' assessment applications due to inconsistency with the Community Plan. We need not resolve this issue.

Maui County's argument concerning appealability to the Commission would be pertinent to whether an applicant had exhausted its administrative remedies prior to seeking judicial review of a decision by the Director, but it is of no consequence to the ripeness analysis applied to takings claims. The *Williamson* decision was crystal clear:

> While the policies underlying the two concepts [ripeness and exhaustion] often overlap, *the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury;* the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate.

*Williamson*, 473 U.S. at 193, 105 S.Ct. 3108 (emphasis added).

The Supreme Court specifically rejected the proposition that the initial, concrete, decision must be appealed before a takings claim becomes ripe:

> [R]espondent would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking.

*Id.*

Accordingly, we conclude that Appellants were not required to appeal the Director's decision that their assessment application could not be processed because "[t]he proposed Single–Family dwelling is inconsistent with the Community Plan." The Director's decision satisfied the finality requirement for ripeness by setting forth a definitive position regarding how Maui County will apply the regulations at issue to the particular land in question.

### 2. *Amendment to the Community Plan*

▉ Maui County argues that Appellants failed to obtain a final decision regarding the application of the "park" use designation for their properties because they did not seek an amendment to the Community Plan to change the "park" designation. The County argues that a Community Plan amendment is essentially a "variance" from the Community Plan and, thus, as with the possibility of a variance in *Williamson*, the Director's decision leaves open the possibility that Appellants may develop their properties after obtaining an amendment to the Community Plan. *Cf. Williamson*, 473 U.S. at 192–94, 105 S.Ct. 3108. Appellants argue that, under *GATRI v. Blane*, 88 Hawai'i 108, 114, 962 P.2d 367, 373 (1998), the Community Plan has "the force and effect of law" and that the

doctrine of ripeness does not require property owners to seek a change in law prior to seeking just compensation for a regulatory taking.

It is undisputed that, in *Williamson*, the Supreme Court held that the property owners' claims were not ripe for adjudication because they had not availed themselves of the procedure for obtaining variances. *See Williamson*, 473 U.S. at 188, 193–94, 105 S.Ct. 3108. The dispute here is whether an amendment to the Community Plan is, in effect, a variance that must be sought in order for Appellants' claims to be justiciable.

First, we must consider the nature of the Community Plan itself, as explicated by the Hawai'i Supreme Court in *GATRI*. The plaintiff in *GATRI* submitted an SMA minor permit application to the Director, seeking to build a 470 square foot snack shop on its property, which was zoned B–R Resort/Commercial, but designated "single-family residential" in the Community Plan.[7] *GATRI*, 88 Hawai'i at 109, 962 P.2d at 368. It was undisputed that the proposed use was allowable under the applicable zoning. *Id.* Similar to the Director's decision in this case, the Director in *GATRI* concluded, *inter alia*, that "the proposed action cannot be processed because it is not consistent with the community plan[.]" *Id.* at 110, 962 P.2d at 369.

The plaintiff in *GATRI* appealed the Director's decision to the Circuit Court. *Id.* The Circuit Court reversed the Director's decision and the Director appealed to the Hawai'i Supreme Court. *Id.* at 110–11, 962

P.2d at 369–70. The supreme court addressed two issues. The supreme court's disposition of the first issue, whether GATRI exhausted its administrative remedies prior to its appeal to the circuit court, is not relevant to the ripeness issue in this case. *See GATRI*, 88 Hawai'i at 111–12, 962 P.2d at 370–71. In *GATRI*, the plaintiff sought direct judicial review of the substance of the Director's decision. Thus, the exhaustion of administrative remedies was at issue. Here, the Appellants have not sought direct judicial review of the Director's decision; rather, Appellants have brought claims based on the effect of the Director's decision.

In the second issue before it, the supreme court held that the Director did not err in his decision not to process GATRI's application because it was inconsistent with the Community Plan, which in the County of Maui is a part of the general plan, and which contains a specific, relatively-detailed land use plan. *GATRI*, 88 Hawai'i at 112–15, 962 P.2d at 371–74. The supreme court based its conclusion on its interpretation of the governing law, reflected in its holding that the Community Plan "was adopted after extensive public input and enacted into law by the Maui County Council ... as an amendment to section 2.80.050 of the Maui County Code", "[i]t is part of the general plan of Maui County," and, "[t]herefore, it has the force and effect of law and a proposed development which is inconsistent with the [Community Plan] may not be awarded an SMA permit without a plan amendment." *Id.* at 115, 962 P.2d at 374.[8]

---

7. The Community Plan at issue in *GATRI* was the Kihei–Makena Community Plan, as adopted by the Maui County Council in 1985, in Ordinance No. 1490. That Community Plan was updated in 1997 and is now referred to as the 1998 Kihei–Makena Community Plan, the same plan that is at issue in the instant case.

8. We note that the developer in *GATRI* sought an SMA minor use permit for a proposed "development" under the CZMA. 88 Hawai'i at 109–10, 962 P.2d at 368–69. Here, by contrast, the proposed use-the construction of single-family residences-is not considered a "development" under the CZMA unless the authority finds a cumulative impact or significant environmental effects. HRS § 205A–22. Although the CZMA does not expressly require consistency for proposed land uses that are not considered "developments," the

Maui County Code (**MCC**) renders the Community Plan binding on all county officials. MCC 2.80B.030(B) (2006). Under the express language of the code, neither the director nor the Planning Commission may approve land uses that are inconsistent with the Kihei–Makena Community Plan. *Id.; see also Pono v. Molokai Ranch, Ltd.*, 119 Hawai'i 164, 192, 194 P.3d 1126, 1154 (App.2008) ("Under the MCC, before the [Department of Public Works and Waste Management] or any other county agency issues a permit, the agency must ensure that the project in question adheres to the specifications of the general plan and community plans of Maui County"), *abrogated on other grounds by County of Hawai'i v. Ala Loop Homeowners*, 123 Hawai'i 391, 235 P.3d 1103 (2010); *see also* MCC 19.04.015(A) (1991) (purpose of zoning is to regulate land usage in accordance with general and

Accordingly, the supreme court has determined that the Community Plan before us is a legislative enactment, with the full force and effect of law. As the issue was not presented in *GATRI*, the supreme court did not consider whether an amendment to the Community Plan was in the nature of a variance for the purpose of a takings claim ripeness analysis. Nevertheless, Maui County's argument that a Community Plan amendment is essentially an administrative remedy akin to a variance is incompatible with the supreme court's characterization of the Community Plan.

Moreover, a legislative act "predetermines what the law shall be for the regulation of future cases falling under its provisions," whereas a non-legislative act "executes or administers a law already in existence." *Sandy Beach Defense Fund v. City Council of the City & Cnty. of Honolulu,* 70 Haw. 361, 369, 773 P.2d 250, 256 (1989) (quoting *Life of the Land v. City Council of the City & Cnty. of Honolulu,* 61 Haw. 390, 423–24, 606 P.2d 866, 887 (1980)). Issuing SMA permits involves "application of general standards to specific parcels of real property," and is therefore an administrative act. *Id.* By contrast, a Community Plan amendment can only be achieved by ordinance of a legislative body, the Maui County Council-an act that does not merely execute or administer a law already in existence. *See* Maui County Charter § 3–6 (2003) (designating the council as the county's legislative body); § 4–1 (2003) ("[e]very legislative act of the council shall be by ordinance").

A Community Plan amendment cannot be equated with a zoning variance or similar relief. A variance is a thoroughly administrative mechanism that changes the effect of an existing law on a particular property. *See* MCC § 19.520.050 (1991). Because the Community Plan is legally binding, an amendment amounts to a change of the existing law rather than an administrative exception to its application.

A comparison of the two processes supports this conclusion. The Maui Board of Variances and Appeals, an administrative agency, has authority to grant variances from an existing land use regulation if it determines the regulation imposes unique hardship on a specific property. MCC § 19.520.050(C). The landowner must file an appropriate application, and the board must hold a public hearing. MCC §§ 19.520.020 (1997), 19.520.030 (1991).

In some respects, the process for obtaining a Community Plan amendment appears similarly administrative in nature: an individual landowner may apply, on an individual basis, at any time for an amendment on a promulgated form; and the Planning Commission reviews the application and sets it for a public hearing. MCC § 2.80B.110(A), (B) (2006). However, the bulk of the process is legislative. Following review of the application, the Planning Commission has no authority to approve or deny a proposed amendment. Instead, its role is limited to providing findings, conclusions, and recommendations. MCC § 19.510.020(A)(6)(7); Maui County Charter § 8–8.4. The Commission must transmit the application along with

community plans); MCC 19.510.040(A)(4)(b) (1991) (change of zoning must comply with community plan). The language of the SMA Rules comports with this outcome, stating in mandatory terms that "the director *shall* make a determination ... that the proposed action *either:* ... (5) Cannot be processed because the proposed action is not consistent with the county general plan, community plan, and zoning[.]" SMA Rule 12–202–12(f) (emphasis added). In any case, the Director's decision that Appellants' assessment applications could not be processed had the same effect as a determination that it was a development. If, because of a "cumulative impact or a significant environmental or ecological effect," a single-family residence is considered a development, then an SMA permit would be re-

quired. If a permit were required, it could not be approved because it would be inconsistent with the Community Plan. Thus, regardless of the denomination of the assessment application, the Director's determination of inconsistency with the Community Plan precludes further processing under applicable law. *See GATRI,* 88 Hawai'i at 115, 962 P.2d at 374; *see also Palazzolo,* 533 U.S. at 620–21, 121 S.Ct. 2448; *McCole v. City of Marathon,* 36 So.3d 750, 754 (Fla.Dist.Ct. App.2010) (decision is ripe when it becomes clear that further applications would be futile); *Howard v. County of San Diego,* 184 Cal.App.4th 1422, 109 Cal.Rptr.3d 647, 653 (2010) (recognizing futility as an exception to ripeness); *accord, Schooner Harbor Ventures, Inc. v. United States,* 92 Fed.Cl. 373, 381–82 (Fed.Cl.2010).

its recommendations to the Maui County Council, which has the ultimate decision-making authority. Maui County Charter § 8–8.6(1); MCC § 2.80B.110(B), (C). The County Council must first hold another public hearing on the proposed amendment. MCC § 2.80B.110(D). The council may approve an amendment only by ordinance, which must be submitted to the mayor and either approved or vetoed. Maui County Charter §§ 8–8.6(1), 4–3(1). Indeed, unlike an administrative variance, there are no specific criteria that govern the council's decision on whether to amend the Community Plan. The amendment process is therefore more akin to enacting a zoning ordinance than obtaining a variance from existing regulations. *See Save Sunset Beach Coal. v. City & Cnty. of Honolulu*, 102 Hawai'i 465, 473–74, 78 P.3d 1, 9–10 (2003) (holding that rezoning is a legislative function).

In *Kailua Community Council v. City & County of Honolulu*, the supreme court addressed this issue in the nearly identical context of a general plan amendment, which on O'ahu is accomplished by ordinance of the city council. 60 Haw. 428, 432–33, 591 P.2d 602, 605 (1979). The chief planning officer and the planning commission performed "a purely advisory function," akin to that of a legislative committee, in submitting their recommendations to the city council. *Id.* at 433, 591 P.2d at 606. The court observed that "the final operative act giving legal effect to the proposal is the legislative action of the city council." *Id.* at 432, 591 P.2d at 605. As a result, the council's approval or denial of a proposed general plan amendment is an "exercise of its legislative function." *Id.*

 Because a Community Plan amendment is not an administrative act, it cannot reasonably be required as a step in reaching a final agency determination for ripeness purposes. *See, e.g., Ward v. Bennett*, 79 N.Y.2d 394, 583 N.Y.S.2d 179, 592 N.E.2d 787, 790 (1992) (holding that landowners were not required to pursue a legislative "demapping" procedure for ripeness purposes); *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 938 F.2d 153,

157 (9th.Cir.1991) ("[R]ipeness did not require the plaintiffs to ask [the government] to amend the 1984 [regional] Plan before bringing their [federal takings] claims."); *GSW, Inc. v. Dep't of Natural Res.*, 254 Ga.App. 283, 562 S.E.2d 253, 255 (2002). Ripeness requires only that landowners take advantage of any available variances or waivers under existing law; it does not require them to undertake changing the law itself. *See Palazzolo*, 533 U.S. at 620, 121 S.Ct. 2448.

In a California case nearly identical to the one at bar, the court held that the landowners' failure to obtain a general plan amendment was not a bar to ripeness. *Howard*, 109 Cal.Rptr.3d at 654–55. Although the *process* for obtaining a general plan amendment could be characterized as administrative in nature, the ultimate decision was, as here, "a legislative one to be voted on, after notice and a hearing, by the County's Board of Supervisors." *Id.* at 654. Accordingly, the landowners could not be required to pursue a legislative remedy to attain ripeness. *Id.* at 655.

For these reasons, we hold that Appellants are not required to seek a change in the applicable law, *i.e.*, the Community Plan, in order to satisfy the ripeness requirement for their takings claims.

## V. CONCLUSION

We conclude that the Circuit Court erred in its determination that it lacked subject matter jurisdiction because Appellants' claims were not ripe for adjudication. Accordingly, we vacate the Circuit Court's June 5, 2009 Amended Judgment in Civil No. 07–1–0496 and October 15, 2009 Final Judgment in Civil No. 09–1–0413, and we remand for further proceedings.